Filed 9/12/22  P. v. Castro CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B308598 |
| Plaintiff and Respondent, | Los Angeles County Super. Ct. No. VA119303 |
| v. | |
| NICOLE CASTRO, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Raul A. Sahagun, Judge.  Affirmed.

David L. Polsky, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Daniel C. Chang and Heidi Salerno, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Nicole Castro appeals from the superior court's order denying her petition for resentencing under Penal Code section 1170.95.[1]  We affirm because the evidence at the evidentiary hearing established beyond a reasonable doubt that Castro acted as a direct aider and abettor of the murder. She therefore is ineligible for relief.

## FACTS AND PROCEDURAL BACKGROUND

### 1. *The murder and Castro's plea agreement*

Castro met Jahmal Frazier in August 2010 and they started dating.[2]  On October 23, 2010, Frazier—wearing a mask—went into a 7-Eleven store in Bellflower.  Roshan Bhandari was working at the store.  Frazier showed Bhandari a small black gun and demanded money.  Bhandari gave him about $90 from the cash register and safe.  Frazier fled.  Deputy

---

[1]  References to statutes are to the Penal Code.  Effective June 30, 2022, section 1170.95 was renumbered section 1172.6, with no change to the text. (Stats. 2022, ch. 58, § 10.)  For convenience, we refer to the former statute number throughout this opinion.

[2]  We take our statement of facts from the following: (1) Castro's statement of facts in her opening brief on appeal; (2) the opinion of another panel of this court in Frazier's appeal from his robbery conviction, which Castro cites in her opening brief, *People v. Frazier* (July 11, 2012, B236057) [nonpub. opn.] (*Frazier*); and (3) Castro's testimony in Frazier's later trial for murder.  We previously granted the Attorney General's request for judicial notice of that testimony under Evidence Code section 459 and California Rules of Court, rule 8.252(a).  In her brief, Castro notes her "statement of facts is derived from the trial court's rendition of those facts, which the parties did not contest, as well as a copy of part of Ms. Castro's trial testimony attached to the prosecutor's response to the petition" in the trial court.

sheriffs arrived in response to a silent alarm and a call from Bhandari's co-worker.  (*Frazier*.)

Deputies saw a man wearing clothes that matched the description of the robbery suspect.  The man, who was near a parked car, ran.  Deputies found Frazier's driver's license, cash in the same denominations taken in the robbery, a mask and other clothing described by the victim, and a black gun in the car.  Frazier eventually was tracked down "and detained by a police canine unit."  Deputies arrested him. (*Frazier*.)

Castro bailed Frazier out of jail and he came to live with her.  She went with him to all his court dates.  On January 20, 2011, a court held a preliminary hearing on the charges against Frazier.  Bhandari testified.  On February 3, 2011, the People filed an information charging Frazier with second degree robbery and alleging personal firearm use in the crime. (*Frazier*.)

One day, after Frazier and Castro left court, Frazier told Castro he wanted to kidnap Bhandari because he didn't want Bhandari to testify against him in his robbery trial. On March 17, 2011, Castro and Frazier went to the 7-Eleven. Frazier wanted to see if Bhandari was working there.  Castro went in, bought a couple of items, and had a conversation with Bhandari while Frazier waited outside.  Castro came out and told Frazier that Bhandari was there.  Frazier told Castro to go back in, "flirt with the witness," and find out what time he got off work.  Castro did so, and learned Bhandari got off work at 4:00 p.m.  Frazier told Castro he wanted to follow Bhandari and find out where he lived.

Later that day, Frazier dressed all in black, grabbed a butcher knife, and left in Castro's car (with her permission). He told her he and his friends were going to follow and kidnap Bhandari.  Frazier returned about five hours later and said he hadn't done anything because Bhandari "had two . . . kids

with him." After court on March 30, 2011, Frazier told Castro he and his friends were "gonna take care of it that weekend before the trial," which was set to begin on April 4.

On April 4, Castro dropped Frazier off at the courthouse and then parked. He texted her not to come into court because Bhandari would recognize her. Castro texted back, "[W]ell, then, that's why you should have did it the night before." Frazier had told Castro that, if Bhandari didn't show up, he'd "get a lesser deal or get off."

Castro drove back to the courthouse around lunchtime. Frazier had her drive to Bhandari's house. Frazier knew Bhandari had a gray or silver Toyota; it was parked in front of the house. Later, between 4:00 and 4:30 p.m., Castro picked Frazier up from the courthouse. Frazier said a jury had been selected and Bhandari had "[taken] the stand." Bhandari was supposed to return to court the next day to finish his testimony. Frazier said "he and his friends needed to take care of it that night."

Frazier took Castro's car (again, with her permission). Castro thought he was going to use it to kidnap Bhandari. Castro was "supposed to be [Frazier's] alibi" whenever he left to go somewhere. Frazier came home around 1:00 a.m. Castro asked him if he'd done anything and "he was like that he hadn't done anything." Castro "just shook [her] head."

When Frazier's robbery trial resumed the next morning, the prosecutor told the court that Bhandari had been shot and killed at about 7:30 a.m. on his way to the courthouse. Frazier's counsel moved for a mistrial on the ground he hadn't had an opportunity to cross-examine Bhandari. The court denied the motion but struck Bhandari's testimony from the day before. Without objection from Frazier's attorney, the prosecution then read from Bhandari's testimony at the preliminary hearing, and

played the 7-Eleven surveillance videotape as well as Bhandari's 911 call. The jury convicted Frazier of robbery and found the personal firearm use allegation true. (*Frazier*.)

Apparently in separate cases, the People charged Castro and Frazier with Bhandari's murder. In Castro's case, VA119303, the People alleged under section 190.2, subdivision (a)(10), that Bhandari "was a witness to a crime and was intentionally killed because of that fact." They also alleged Castro aided and abetted Bhandari's murder, and she intentionally killed the victim by lying in wait within the meaning of section 190.2, subdivision (a)(15). In addition, the People alleged a principal in the offense was armed with a handgun. The record on appeal does not contain a charging document against Frazier but, according to the trial transcripts we have judicially noticed, the case number was VA128849.

On September 21, 2016, Castro entered into a plea agreement with the People. Castro pleaded guilty to second degree murder. She agreed to appear in court when subpoenaed or ordered by the court and to testify truthfully at Frazier's trial.[3]

## 2.    *Castro's testimony at Frazier's trial*

In March 2019, Castro testified over the course of four days at Frazier's trial. Castro testified Frazier woke her up around 6:40 or 6:45 a.m. on April 5, 2011. They left the house about 7:05 a.m. in her car. Frazier wanted Castro to drive him to Bhandari's house so he could call his friends to meet him there. Castro told Frazier she "didn't want him to do it." He "didn't say nothing."

---

[3]    Castro apparently initialed and signed a written waiver and plea form (see *In re Tahl* (1969) 1 Cal.3d 122) as well as a four-page plea agreement. Neither the form nor the plea agreement is part of the record on appeal.

She "took him to [Bhandari's] house anyway." Frazier sat in the back seat on the passenger side because the tint is darker on Castro's back windows; Frazier didn't want Bhandari to see him. When they got to Bhandari's house about 15 minutes later, his car wasn't there. Frazier told Castro to drive to the 7-Eleven. She didn't voice any opposition; she "did what [she] was told."

When they arrived at the 7-Eleven, Castro first drove by so Frazier could look into the store. Frazier told Castro to pull into the back alleyway and she did. He wanted to see if Bhandari's car was parked back there and if there were any cameras. Castro then backed out and parked on the corner.

Castro stayed in that spot more than an hour. At one point a police car arrived. Frazier wanted to see if the officer was talking to Bhandari. Castro drove around the corner so Frazier could look into the store; it appeared the officer was just buying some items. Frazier told Castro to turn back and park in the same spot. She did. Frazier said he was waiting for his friends, including "Fat Boy," to come but nobody ever came.

Eventually Castro told Frazier she had to urinate. Frazier said "[she] couldn't leave because we were gonna miss them." Castro crawled into the back seat and urinated in a cup. When Castro was in the back seat, she saw a gun on Frazier's lap. Before then, Castro testified, she hadn't known Frazier had a gun. Castro admitted having heard Bhandari's testimony at the preliminary hearing that the perpetrator had pointed a gun at him during the robbery. When Castro saw the gun, "[t]hat's when [she] became scared" and "worried." She was "like, okay, this is not a kidnapping. This is going to be something else like," "[t]hat he was going to hurt the witness." Castro asked Frazier what he was going to do "but he didn't say nothing like." He was silent and his demeanor changed. Castro testified, "There was nothing I could do. I'm in a car with somebody with a gun."

6

"Within minutes," Bhandari came out the door. Frazier told Castro to hurry up and back up. Castro backed her car into the alleyway. The car was stopped, facing the street; the engine was running. Frazier got out of the rear passenger side with a gun. Frazier punched Bhandari in the face. Frazier hit him again and he fell. Within seconds, Castro heard gunshots. She also heard high-pitched screaming, "like a girl." Bhandari screamed both before and after Castro heard the shots. Frazier ran back toward Castro's car, then ran back toward Bhandari and shot him a third time.

Frazier jumped into the back seat and told Castro, "Go, go babe, go." Castro "sped away" and took Frazier to the courthouse for his robbery trial. He changed clothes on the way. Frazier told Castro to "take the gun to the house and keep it there and he would deal with it when he got home." Castro responded she was not taking the gun to the house "because that was the first place that they were gonna look." Castro went home to change clothes and then went to a park, walked into a wooded area, and threw the gun into a body of water. She heard it splash. Castro took Frazier's clothes and the latex gloves he'd been wearing and threw them into a trash can.

At 9:39 that morning, Castro texted Frazier, "Can we have a baby?" At 10:16 a.m., she texted him, "I fucking love you."

Around noon Frazier's lawyer called Castro and told her Frazier had been remanded. Frazier wanted Castro to put money on his books. Later that afternoon, Castro's father called her and told her to come home; detectives wanted to speak with her. Detectives took Castro to the Lakewood station, questioned her, and then placed her under arrest.

At Frazier's trial, the prosecutor asked Castro, "When you saw the gun [in Frazier's lap], did you think [he] was going to kill the witness?" Castro answered, "Yes." The prosecutor

asked, "And at the time when he instructed you to back the car into the alley, you already knew that he was going to kill the witness?" Castro replied, "Yes. I had a . . . feeling that he was gonna hurt him. He was gonna kill him." The prosecutor continued, "But you did it anyway?" Castro said, "I backed up because at that point he had a gun and I felt I had no other options, I had to." The prosecutor asked, "[D]id you think he was gonna use the gun on you?" Castro replied, "I didn't know."

### 3. *Castro's sentencing*

On July 26, 2019, Castro appeared before the trial court with counsel. The court—who had tried Frazier's case—found Castro "substantially complied with the terms of the plea bargain," stating, "[T]he court does find that she testified truthfully during the proceedings." Accordingly, the court sentenced Castro to 15 years to life in accordance with the plea agreement.[4] Even though Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill 1437) had taken effect as of January 1, 2019 (see Stats. 2018, ch. 1015, § 4), Castro did not raise any issue about her sentence.

### 4. *Castro's petition for resentencing and the evidentiary hearing*

One month after she was sentenced, Castro filed a petition for resentencing under section 1170.95. On a check-the-box form, Castro declared an information had been filed against her "that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine"; she pleaded guilty to second degree murder "in lieu of going to trial" because she "believed [she] could have been convicted of [second] degree murder at trial pursuant to the

---

[4] The record does not reflect when the court struck the special allegations against Castro.

8

felony murder rule or the natural and probable consequences doctrine"; she "could not now be convicted of [second] degree murder because of changes made to Penal Code §§ 188 and 189"; and she "was convicted of [second] degree murder under the natural and probable consequences doctrine or under the [second] degree felony murder doctrine and [she] could not now be convicted of murder because of changes to Penal Code § 188 . . . ." Castro asked the court to appoint counsel for her. Castro attached a note stating, "My case was clearly an example of being found guilty due to the Felony Murder Rule & how I should have been charged. I took my deal based upon Mr. Canty[5] My lawyer constantly telling Me I would be found guilty of felony Murder if I went to trial."

The trial court reappointed Mark Khalaf, the same attorney who had represented Castro at her sentencing. On January 17, 2020, the prosecution filed a response to Castro's petition. The prosecution summarized the facts, attached transcript pages of Castro's testimony at Frazier's trial, and asserted she was ineligible for resentencing because "[t]his was a premeditated execution." "Castro committed a first degree murder by means of lying in wait," the prosecution said; "[s]he was allowed to plead to a second degree murder to secure her truthful testimony against Jahmal Frazier." The prosecution stated, "The felony murder doctrine does not apply." The prosecution also filed an opposition arguing section 1170.95 was unconstitutional.

On February 14, 2020, Castro filed her "merits brief in support of her motion for resentencing." Castro contended "there was no evidence adduced at trial . . . that she had

---

[5] When she entered her plea, Castro was represented by Alternate Public Defender David Canty.

9

the intent to kill when she aided and abetted the underlying kidnapping that she was informed was to occur."[6]  Castro asserted she had "always maintained, through her proffer and her testimony at Mr. Frazier's trial, that she believed Mr. Frazier and his associates were going to kidnap the victim in order to stop his testimony at the robbery trial."  "It was only when [she] saw Mr. Frazier with a gun," she said, "minutes before the murder, that she believed Mr. Frazier was going to harm the victim."  Castro stated she "was scared for her life once she saw the gun."  She argued she had met "the prima facie requirements" and "the People would not be able to show beyond a reasonable doubt that she intended to kill the victim."  Castro also filed a brief addressing the issue of the statute's constitutionality.

On March 6, 2020, counsel appeared before the court. Castro was not present.  The court stated it was "not inclined to rule that [section 1170.95] is unconstitutional."  Turning to whether Castro had established a prima facie case, Khalaf said, "[Y]ou have the felony murder rule here[.] . . . I know they're saying it wasn't filed as that, but the [record] clearly substantiates that this is a felony murder."  The court replied, "[I]t was never filed as a felony murder."  Khalaf referred to "natural and probable consequences," and said the evidence did not establish "the intent to kill because her intention was to help him kidnap."

The prosecutor responded, "The defendant knew there was going to be a murder[;] she continued to lie [in] wait for the victim to exit after she knew that there was going to be a murder. The victim exited, she backed the car up, pulled into the alley,

---

[6]     The People never charged Castro with kidnapping or attempted kidnapping.

allowed her co-defendant to get out, accomplish the murder, drove him away and dropped him off at this courthouse and her first text to him after he gets out of the car is, 'I f[']ing love you.' Not, 'What did you do?' " In response to a question from the court, the prosecutor confirmed he was arguing Castro could be convicted of murder even if she "formed . . . the intent to kill after she saw the gun because she moved the car after she saw the gun."

Counsel and the court continued to discuss the issues at some length, including whether Castro could have been convicted on a felony-murder theory with an underlying felony of attempted kidnapping. The court issued an order to show cause and set an April 30 date. The court said, "It would be helpful to have some briefing on reckless indifference."

The court asked counsel, "I don't think I need her here, do I? . . . If I were to grant relief, she has to be here, but I don't think I need her here for the motion. [¶] Even if I were to grant relief, she would not be resentenced on that day, so I don't think I need her here, or I shouldn't say that. I don't think she has a right to be here on the OSC." Castro's counsel did not disagree with the court's statements, nor is there any indication in the record that he ever asked the court to order his client out from state prison for the hearing.

The record doesn't reflect what happened on the April 30 date but proceedings apparently were postponed due to the pandemic. Counsel returned to court on June 30, 2020. The court asked if counsel wished to proceed on the order to show cause. Khalaf said he was "prepared to proceed on the case law and research" that he had done, but he had been unable to go to the office because of the pandemic. The court stated, "This is a significant case . . . it's a case which should be thoroughly briefed and argued." Both attorneys proposed putting the matter

11

over so they could file additional briefing. The parties agreed on a September 24 date. Again, Castro's counsel did not raise the issue of her appearance at the hearing.

Counsel returned on September 24, 2020. Khalaf told the court, "Your Honor, I have been in communication with my client and she has requested that she would like to be present for this hearing. I just wanted to make that request made and in order for the record, Your Honor." The court replied, "Well, if I were to grant the petition, she certainly would be present for any resentencing." "I don't know whether she's entitled to be present. I have seen some language which considers this hearing a critical stage which would allow her to be here." The court then asked, "Either counsel, People, have any opinion on whether I can go forward without her presence, certainly not as to the sentencing, that's off." "Clearly, she would have a right to be here."

The prosecutor said, "I don't believe she has a right to be here. I mean, she can want to be here, but I don't think she is a necessary person for this particular type of motion." The court then stated, "I'm not going to take any evidence and I don't think I'm going to make any credibility calls—actually, the ones that I make are going to be pretty much in favor of the defendant. [¶] There is not much, if at all, that I didn't find her credible . . . nor was there much of a contest in the facts. So I'm inclined to go forward because I think this is strictly a question of law and not a question of fact." Castro's counsel repeated, "just for the record," the defense request that she be present. The court replied, "I don't know that there is any of her testimony that I'm not going to credit. I can't think of any."

The court then gave "a summary of the facts" and a tentative ruling. The court added, "If in my recitation of the facts either counsel think[s] it is inaccurate, please st[o]p me

12

and we will look through those facts."   The court noted the case was "a little unusual in that it's a plea," but "unlike most pleas where you're restricted to the preliminary hearing," here Castro had testified for four days at trial.

The court detailed Castro's testimony at length, quoting at times from the trial transcripts.  Castro's counsel then said Frazier had always told Castro "it was gonna be a kidnapping." The court stated it credited Castro's testimony on that point, "as illogical as that may be."  "But," the court continued, "this is where I think the case turns":

> "Once she sees the gun she states, oh-oh, this is bad.  She thinks he's gonna kill this guy. That, alone, I don't think is enough to get it to murder and it may not be enough to get her on a felony murder, the target crime being kidnapping. [¶] But here is the problem . . . they sit there, they wait, the victim . . . comes out of the 7-Eleven and [Frazier] tells her, 'Back up the car.' [¶] So she backs up the car, she backs it into the driveway, . . . now they can see . . . the witness through that breezeway and he's walking toward Mr. Frazier.  That conduct of moving the car assists Mr. Frazier in the murder.  If she doesn't do that, the killer then has to get out of his car, walk all the way across the parking lot and confront and try to kill the witness."

The court noted Bhandari would have recognized Frazier. The court continued,

> "So by driving the car back into the driveway into that breezeway that assists Mr. Frazier in the killing.  That helps him.  She's no longer

13

a bystander, she has now materially assisted him in the killing. [¶] She has also added the element of surprise to the attack where before [Frazier] would have to sprint or run across the parking lot, and who knows what the witness would have done, fought, run, yelled, who knows. But, instead, he's stuck in this breezeway at point blank range and he's struck and murdered on the spot and that's . . . where I think that she becomes a straight aider and abettor. When she moves the car knowing he has the gun back over there, then that's a problem."

The court went on to say, in the alternative, that if it were "a felony murder with kidnap being the target offense," the evidence showed Castro was a major participant who acted with reckless indifference for human life.

Castro's counsel seemed not to take issue with the court's conclusion that Castro was a major participant in the underlying felony, though later he said he didn't believe she was. Counsel focused most of his argument on his assertion that Castro had not acted with reckless indifference to life. Counsel stated, "At the time this happened, she wasn't there." The court replied, "She was a stone's throw away from the killing. She was there." "She drove him back, he gets out and he's in the . . . breezeway walking toward there, she is right there. She could have honked the horn, she could have yelled."

The prosecutor argued section 1170.95 didn't "apply to intentional killing" and Castro committed a first degree murder by lying in wait. As far as a felony-murder theory, the prosecutor stated, "[S]he actively participated even more knowing that a death was going to occur. At the point where she backed up she

14

knew she was going to be the wheel man." He continued, "[Y]ou couldn't be more of an aider and abettor than the wheel person in a kidnapping because you are the one who is taking them away from that area to facilitate the kidnapping." "She was an active participant, she knew what she was doing, she knew that there was going to be a killing and that's exactly what happened."

Ultimately, the trial court denied Castro's petition. The court agreed with Khalaf that Castro "went there for the purpose of kidnapping." "[H]ad she stayed in front of the 7-Eleven" and Frazier had "jumped out, rushed over there and killed the guy," the court continued, Castro "would have a pretty strong argument" that she wasn't an aider and abettor, nor someone who acted with reckless indifference to life, "because she did not share the intent to kill once he hops out of the car."

"The problem," the court reiterated, was Castro "facilitate[d] the murder" by backing the car up and going into the alleyway. "[N]ow," the court continued, Castro and Frazier were "looking at the victim as he's walking through the breezeway and they're surprising him." Castro "facilitate[d] that." Frazier "can't do that"—"attack and kill" the victim— "without that car moving over there."

As for Castro's testimony that she backed up because she "felt [she] had no other options," the court noted that was essentially a claim of duress, which was not a defense to murder.[7] The court continued,

> "[T]he question is, is she a straight aider
> and abettor to the murder and I think she is
> because she facilitates it, she moves the car,
> she backs it up. [¶] She could have done a lot of

---

[7] "[D]uress is not a defense to any form of murder." (*People v. Anderson* (2002) 28 Cal.4th 767, 780.)

15

things. She could have refused to move the car, then Frazier is on his own and he's got to run through the parking lot and hope the guy[ ] doesn't see him before he gets in his fatal blow. [¶] Two, she could have honked the horn giving the guy a warning. [¶] Three, when she backed up, now she's pretty close to the guy, she could have continued to honk the horn. She could have done a lot of things, but she didn't, she facilitated it and I don't know how you get around that. How do you get around that she helped him kill the witness."

## DISCUSSION

1.  ***Section 1170.95***

Senate Bill 1437 took effect on January 1, 2019. (See Stats. 2018, ch. 1015, § 4.) It limited accomplice liability under the felony-murder rule and eliminated the natural and probable consequences doctrine as it relates to murder to ensure a person's sentence is commensurate with his or her individual criminal culpability. (*People v. Gentile* (2020) 10 Cal.5th 830, 842-843 (*Gentile*); *People v. Lewis* (2021) 11 Cal.5th 952, 957, 971 (*Lewis*).)

Senate Bill 1437 amended the felony-murder rule by adding section 189, subdivision (e). It provides that a participant in the perpetration of qualifying felonies is liable for felony murder only if the person: (1) was the actual killer; (2) was not the actual killer but, with the intent to kill, acted as a direct aider and abettor; or (3) was a major participant in the underlying felony and acted with reckless indifference to human life as described in section 190.2, subdivision (d). (See *Gentile*, *supra*, 10 Cal.5th at p. 842.) It amended the natural and probable consequences doctrine by adding subdivision (a)(3) to section 188, which states that "[m]alice shall not be imputed

to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3).)

Senate Bill 1437 also authorized, through new section 1170.95, an individual convicted of felony murder or murder based on the natural and probable consequences doctrine to petition the sentencing court to vacate the conviction and be resentenced on any remaining counts if she could not have been convicted of murder because of Senate Bill 1437's changes to the definition of the crime. (See *Lewis*, *supra*, 11 Cal.5th at pp. 959-960; *Gentile*, *supra*, 10 Cal.5th at p. 843.)

If the petitioner makes a prima facie showing under section 1170.95, the trial court is required to issue an order to show cause and to hold an evidentiary hearing to determine whether to vacate the conviction, recall the sentence, and resentence the petitioner. (§ 1170.95, subds. (c), (d).) The burden at that hearing rests with the prosecution "to prove, beyond a reasonable doubt, that the petitioner is guilty of murder . . . under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019." (§ 1170.95, subd. (d)(3).)[8]

## 2. *Our standard of review*

On appeal from a trial court's denial of relief under section 1170.95 following an evidentiary hearing, we review the trial court's determination for substantial evidence. (*Garrison*, *supra*, 73 Cal.App.5th at p. 747.) We examine

---

[8] Effective January 1, 2022, Senate Bill No. 775 (2021-2022 Reg. Sess.) expanded section 1170.95's scope and amended its procedures. (See Stats. 2021, ch. 551, § 2.) Among other things, the new legislation requires "the trial court, acting as an independent fact finder, to determine beyond a reasonable doubt whether [the] defendant is guilty of murder under a valid theory of murder." (*People v. Garrison* (2021) 73 Cal.App.5th 735, 745 (*Garrison*).)

the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—that would support a rational trier of fact in finding the defendant guilty beyond a reasonable doubt.  (*People v. Clements* (2022) 75 Cal.App.5th 276, 298 (*Clements*); *People v. San Nicolas* (2004) 34 Cal.4th 614, 657-658; *People v. Westerfield* (2019) 6 Cal.5th 632, 713.)  We resolve all evidentiary conflicts and questions of credibility in favor of the judgment.  (*People v. Brady* (2018) 22 Cal.App.5th 1008, 1014, quoting *People v. Cardenas* (2015) 239 Cal.App.4th 220, 226-227.)  We cannot reweigh the evidence or reassess witness credibility on our own.  (*People v. Young* (2005) 34 Cal.4th 1149, 1181 [resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact].)

3.  **The error in holding the evidentiary hearing in Castro's absence was harmless beyond a reasonable doubt**

Castro contends the trial court erred by "den[ying] her expressed request to be present" for the hearing under section 1170.95, subdivision (d), and it didn't "matter that the parties . . . decide[d] to proceed on the record and not to present new evidence."  The Attorney General asserts Castro did not have a constitutional right to be present at the evidentiary hearing and, in any event, any error was harmless.

After the parties completed briefing in this case, the Fourth District Court of Appeal, Division 1, issued *People v. Basler* (2022) 80 Cal.App.5th 46.  *Basler* held a petitioner in a section 1170.95 proceeding has a right under the federal and California constitutions to be present at an evidentiary hearing conducted under subdivision (d).  (*Basler*, at pp. 50-51, 56-60.)  If a petitioner was not present at the hearing, the reviewing court "ask[s] whether [her] absence was harmless beyond a reasonable

18

doubt." (*Id*. at p. 59, citing *Chapman v. California* (1967) 386 U.S. 18, 24.)  The defendant "bears [the] burden of demonstrating [her] absence resulted in prejudice or denied [her] right to a fair hearing." (*Basler*, at p. 59, citing *People v. Blacksher* (2011) 52 Cal.4th 769, 799.)

On this record, going forward with the hearing in Castro's absence was harmless beyond a reasonable doubt.  The trial court had heard, and seen, Castro testify at length at Frazier's trial, over the course of four days.  The court found she had testified truthfully in those proceedings.  At the evidentiary hearing, the court said it could not think of any of Castro's testimony it was "not going to credit."  The court agreed with Khalaf that Castro "thought it was gonna be a kidnapping."  But the court denied the petition because Castro—having seen the gun and knowing Frazier was going to shoot the victim—backed her car up and pulled into the alleyway to bring Frazier close to the unsuspecting victim.  In doing so, she "helped him kill the witness."

Castro does not identify any further testimony or additional evidence she could have presented at the hearing had she been present.  In her appeal brief, Castro takes her statement of facts "from the trial court's rendition of those facts, which the parties did not contest."  Indeed, having testified under oath at length— and, the court found, honestly—at Frazier's trial, Castro herself presented the evidence establishing beyond a reasonable doubt that she aided and abetted Frazier in Bhandari's murder.

4.     **Substantial evidence supports the trial court's conclusion that Castro is ineligible for relief because she was a direct aider and abettor who acted with malice**

Castro contends there was "no evidence that she shared Mr. Frazier's intent—that she intended to facilitate the killing

19

and to bring about Mr. Bhandari's death." She argues she "was motivated by fear and only fear." "There was no direct evidence" —Castro says—"that she drove down the alley with the intent to facilitate the shooting . . . ."

If by "direct evidence" Castro means testimony that she admitted she intended for Bhandari be killed, or that she said to Frazier, "Let's kill him!", that sort of evidence is rare indeed. "Because direct evidence of a defendant's intent rarely exists, intent may be inferred from the circumstances of the crime and the defendant's acts." (*People v. Sanchez* (2016) 63 Cal.4th 411, 457.)

Murder is "the unlawful killing of a human being, or a fetus, with malice aforethought." (§ 187, subd. (a).) Malice may be express or implied. (§ 188, subd. (a).) "Express malice requires a showing that the assailant either desires the victim's death or knows to a substantial certainty that the victim's death will occur." (*People v. Covarrubias* (2016) 1 Cal.5th 838, 890; *People v. Beltran* (2013) 56 Cal.4th 935, 941 [express malice is an intent to kill].) "[M]alice is implied when the killing resulted from an intentional act, the natural consequences of which are dangerous to human life, performed with knowledge of and conscious disregard for the danger to human life." (*People v. Thomas* (2012) 53 Cal.4th 771, 814. See also *Gentile, supra*, 10 Cal.5th at p. 850 ["For implied malice, the intent requirement is satisfied by proof that the actual perpetrator ' "knows that his conduct endangers the life of another and . . . acts with conscious disregard for life." ' "].)

Our Supreme Court has "explained that an aider and abettor's guilt 'is based on a combination of the direct perpetrator's acts and the aider and abettor's own acts and own mental state.' " (*People v. Perez* (2005) 35 Cal.4th 1219, 1225, quoting *People v. McCoy* (2001) 25 Cal.4th 1111, 1117.)

Establishing aider and abettor liability thus requires three distinct elements of proof: (1) "a crime committed by the direct perpetrator," (2) "the aider and abettor's . . . knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends," and (3) "conduct by the aider and abettor that in fact assists the achievement of the crime." (*Perez*, at p. 1225; *People v. Carrasco* (2014) 59 Cal.4th 924, 968-969.)

While Senate Bill 1437 eliminated natural and probable consequences liability for second degree murder based on *imputed* malice, *implied* malice remains a valid theory of second degree murder liability for an aider and abettor. (*Gentile*, *supra*, 10 Cal.5th at p. 850 ["an aider and abettor who does not expressly intend to aid a killing can still be convicted of second degree murder if the person knows that his or her conduct endangers the life of another and acts with conscious disregard for life"]; *People v. Rivera* (2021) 62 Cal.App.5th 217, 232 [same]; *People v. Glukhoy* (2022) 77 Cal.App.5th 576, 590, review granted July 27, 2022, S274792 [same]; *Clements*, *supra*, 75 Cal.App.5th at p. 298 [Senate Bill 1437 abolished the natural and probable consequences doctrine but maintained the viability of murder convictions based on implied malice, "and the definition of implied malice remains unchanged"]; *People v. Offley* (2020) 48 Cal.App.5th 588, 595-596 [Senate Bill 1437 did not alter the criminal liability of direct aiders and abettors of murder because those individuals "necessarily 'know and share the murderous intent of the actual perpetrator' "].)

Here, viewing the evidence in the light most favorable to the trial court's findings, substantial evidence supports the conclusion that Castro was a direct aider and abettor. She took an active role in helping Frazier find out what time Bhandari got off work, where he lived, and what kind of car he drove. On the morning of the murder, she drove Frazier to the victim's

home, then on to his workplace. She waited with Frazier for some time for Bhandari to come out of the store. She then backed her car into the alleyway, where she and Frazier could see Bhandari walking toward them, stayed there with the car running while Frazier got out, punched the victim, then shot him twice, then went back and fired a third shot to finish him off. Castro's conduct unquestionably endangered the victim and displays a conscious disregard for the victim's life, even assuming Castro didn't actively want him dead.

Castro then—in her own words—"sped away," dropping Frazier at the courthouse and then disposing of the incriminating evidence. As for her claim of fear, Castro texted Frazier not long after he murdered Bhandari, asking if they could have a baby together and telling him, "I fucking love you."[9]

In sum, substantial evidence supports the trial court's conclusion that Castro remains guilty under the new law because she directly aided and abetted the murder. (See *Clements, supra,* 75 Cal.App.5th at p. 299 [defendant's own trial testimony provided substantial evidence that she acted deliberately and with a conscious disregard for life].)

Finally, the trial court did not—as Castro asserts—apply "an incorrect standard of proof." Castro contends the court

---

[9] The record does not support Castro's contention that the trial court "refus[ed] to consider [her] fear . . . in assessing her intent as an aider and abettor." Contrary to Castro's assertion that the court "limit[ed]" that evidence, the court did not exclude or strike any of Castro's testimony on that point. The court was entitled to weigh Castro's claims of fear against other statements in her testimony, including her texts to Frazier shortly after the murder that she loved him and wanted to have a child with him. We do not reweigh the evidence. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

referred to a "substantial evidence" inquiry.[10]  Castro seizes on variations in verb tense and references to "substantial evidence" taken out of context in the court's statements to argue the court did not require the People to prove beyond a reasonable doubt that she is not entitled to relief.  We are not persuaded.

Section 1170.95 provides relief to individuals who "could not presently be convicted of murder . . . because of changes to Section 188 or 189." (§ 1170.95, subd. (a)(3).)  At the evidentiary hearing, the prosecution must "prove, beyond a reasonable doubt, that the petitioner is guilty of murder . . . under California law as amended by changes to Section 188 or 189." (§ 1170.95, subd. (d)(3).)

At the March 2020 hearing, when the court issued an order to show cause, it stated, "The inquiry is . . . can the People show beyond a reasonable doubt that she would have been convicted under the new statute . . . ."[11]  Later in the hearing, the court said, "The People have to show beyond a reasonable doubt that they can convict the defendant under any theory under the

[10]    See *People v. Duke* (2020) 55 Cal.App.5th 113.  The California Supreme Court later granted review in *Duke*. (Review granted Jan. 13, 2021, S265309.)  On November 23, 2021, the high court transferred the case back to the court of appeal with directions to vacate its decision and reconsider the cause in light of Senate Bill No. 775. (S265309.)  Castro states the court denied her petition four days before *Duke* was issued.  "Thus, [she says] the trial court did not apply *Duke* directly but rather appears to have reached the same conclusion on its own regarding the meaning of the language defining the prosecutor's burden of proof."

[11]    The court began to say, "The inquiry is whether she could have been—" and then corrected itself:  "Can the People show beyond a reasonable doubt that she would have been convicted under the new statute . . . ."

present law and they're proposing malice murder . . . ." Toward the end of the hearing, the court told counsel, "[T]hose are the issues that I'm wrestling with . . . is there enough there beyond a reasonable doubt to convict her of a first once she sees the gun and once she moves the car back?"

At the September 2020 evidentiary hearing, the court recited the facts at length and read from the transcripts of Castro's testimony at Frazier's trial. The court then gave counsel a tentative ruling, stating that, by driving her car into the breezeway, Castro was "no longer a bystander," but "materially assisted [Frazier] in the killing." Once Bhandari was "stuck in the breezeway," the court said, "that's where I think that she becomes a straight aider and abettor." The court found Castro "facilitated" Frazier's execution of the victim—"she helped him kill the witness"—and concluded "the People would be able to prove Nicole Castro guilty beyond a reasonable doubt of murder as a straight aider and abettor." There is no practical difference between saying the People "would be able to prove" Castro ineligible beyond a reasonable doubt and the People "have proved" Castro ineligible beyond a reasonable doubt, especially when that proof consists of Castro's own sworn testimony.

## DISPOSITION

We affirm the trial court's order denying Nicole Castro's petition to vacate her murder conviction and for resentencing under Penal Code section 1170.95.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EGERTON, J.


We concur:



EDMON, P. J.



LAVIN, J.